Good morning, Your Honors. My name is Dawn Reynolds, and I represent the appellant, Andrew Patton. I'd like to reserve a couple of minutes for rebuttal, if that's okay. Mr. Patton was convicted of one count of possession of illicit chemical with intent to manufacture a controlled substance under U.S.C. 841c1 and is currently serving a 168-month sentence at the Sheridan Federal Institution. I believe his 14-year sentence is the logical result of an overzealous government battling what is admittedly a methamphetamine plague. But through its excessive involvement in the commission of the offense, its complete control over the quantity of drugs used to determine Mr. Patton's sentence, the government is responsible for having entrapped Andrew Patton. Further, I believe his sentence should be overturned in that it was the result of evidence which should have been suppressed as the fruit of an untimely, warrantless search of his vehicle and patently manipulated testimony of an unreliable paid informant. And finally, his conviction should be overturned as it was in large part based on an illegal and unverifiable confession obtained by drug enforcement agents during four hours of custodial interrogation which took place at their headquarters in Yakima. Where to begin? Just basically with the problem that we have with the entrapment and the paid informant is that during a critical portion of the government's investigation of this case, the paid informant, Donnie Gerber, simply went missing. So he had no contact, despite instructions from the DEA, he did not make contact with the DEA, and there was nothing to record or observe any drug activity by Mr. Patton during the phase during which the deal would have been struck. So we have no – there's no way of knowing whether what threats, promises, inducements, et cetera, were offered. And then finally, the government controlled completely the amount of pseudoephedrine that was used. Goodburn had presented to the agency that Patton was part of a large organization selling methamphetamine in Yakima and that was producing multi-ounce to pound grams. There was never any controlled by. No one ever bothered to search Mr. Patton's house. He arrived at the scene, I think, in a 1984 Red Blazer, which was registered, I believe, to his mother. He simply wasn't a high-rolling, well-paid drug dealer or drug manufacturer. Goodburn had also promised that the agency would receive samples. None were forthcoming. They didn't bother to set up any type of sting. To compound this, the agency then, after they've set up the sting operation and they take Patton into custody, they leave the vehicle in the impound for a full week before they bother to search it. Well, of course, they know that everything in there is what they have received from the paid informant. And that was another little problem in that the informant had said first that Patton had given him all these supplies and materials that the informant was going to take to a lab and help Patton get started in this business. But first he said Patton brought it to him in Ellensburg, which is about 35 miles from Sealand. Then he changed his story and said, no, no, no, I went to Patton's house and picked this up. When they got to the sting operation, the agents believed it was very, to make their case stick, they needed to get the drug manufacturing equipment into Patton's car and out of the Goodburn's vehicle. So they concocted a ruse that his car had broken down. Then they moved all of the materials into Patton's vehicle. But wasn't, I mean, wasn't it undisputed that some of those manufacturing materials were Patton's? No. It's disputed. The only thing that was ever found, everything that they found in the car was a flashlight. And that was part of the original inventory a week later. And then almost a year later, the agency said, oh, we opened this flashlight that we found in the console of the car and we found traces of methamphetamine. But, no, it was clearly disputed that the supplies were in the control of the Mr. Goodburn. In fact, when the agents went to pick it up, they drove to his house. He had the key to the shed. He unlocked it. The story that he told was that Patton's practice was to wash everything with soap and water so that there would be no fingerprints. Now, despite the transfer of all of this into Patton's blazer, they still never found any fingerprints of his on the actual tubes, jars, mason jars, I would think, especially it would be easy to put a fingerprint on all of the stuff that would pick up fingerprints but nothing. I thought that there was evidence that Patton had the lithium batteries to make a certain quantity. He stated that and then he stated that he had the equipment he needed to manufacture methamphetamine. I apologize. That's true. He brought to the scene a number of, I think it was 36 lithium batteries. That's what he, and that is his sole contribution, I misspoke. And apparently even that was not enough to have, to use their phrase, cooked the amount of pseudoephedrine that was contained in the case, but a fraction of it. But at any rate, then to, then they sort of, I think I used the phrase, backlobed this story by taking him into custody where he is taken to the DEA headquarters in Yakima and he's interrogated for two hours by Agents Vian and Wicht. Now, they admitted that they had recording equipment available and that they read, they said they, they both stated they read him the Miranda card and that he orally waived his rights, but they did not obtain a valid signature. The interrogation went on the next day for a couple of hours, and it dovetails very neatly with the story that Goodburn had given the DEA agents, which was never followed up again. Again, if you'll notice, there are no other related charges here. We don't have other defendants that were brought in as a part of this elaborate confession and the story from the, Mr. Goodburn. Now the obstacle I see to your appeal and all these arguments is that to credit Patton's theory of the case that he was set up, you have to discredit everybody else. And the jury obviously credited everybody else and discredited Patton. I think that the confession by the court allowing Agents Vian and Wicht to take the stand and to recite this hearsay confession was very damning and lent credibility to Goodburn himself, who fumbled around on the stand considerably. And under, like, for example, with U.S. v. Garibay, where there was no signed confession, that was overturned. And certainly the other cases that are cited with regards to a confession, in almost all of these, we're looking at whether or not it was voluntary and whether it was coerced, but in all of them you have so lovely to read these cases because they actually have transcripts of recorded confessions. Here we have nothing like that. Well, where is it required that there be a transcript or that the waiver be in writing? Well, it's a preferred – it would seem that it would be a preferred procedure. But if you – certainly, I mean, I've seen – I think we all have seen lots of confessions where they're written in the field and somebody signs them. There's a card that is signed. We've seen cases where that doesn't happen. I have not seen one where there was neither a recorded confession – well, oh, no, excuse me. Only in, like, the – those types of cases where the defendant is in a police officer's car and blurts out something or he makes a statement that's pre-Mirandized. Then those are certainly not recorded, nor is there a signed confession. But those statements are used. But here where we have a full-blown custodial interrogation, it seems unconscious – it shocks my conscience, too, that the government can – can obtain a confession in this manner without either a signed waiver or any type of written or recorded – But you don't have any case that says that that's a requirement. No, I don't. It's a prerequisite to admitting a testimony. But a long line of cases saying that the government has a responsibility to – How else do we show that there was coercion or no coercion? How else do we verify these things? This is like a domestic version of Bob McGrave. I find it very disturbing. It's like a whole lot of other issues in criminal cases. You know, the officer says he had a firearm. And it says, I didn't have a firearm. And the jury finds that he did. No firearm was found, but the officer said he had it. So that happens all the time, doesn't it? It also would – that would force the defendant to take the stand, which is his right not to take the stand. And the government is allowed to make its case entirely upon an unverified or unrecorded testimony that – There's a case that's a bit off point. It's on whether you have to videotape statements made by children who are alleged to be the victims of sexual abuse. And the Idaho Supreme Court said that that was required as a matter of due process, that they be recorded. And in the case of Idaho against Wright, the Supreme Court said no. You do not have to make a record of those interrogations. Now, if you don't have to do it with kids, why do you have to do it with adults? Well, I suppose it depends on the circumstances where this is truly a custodial interrogation. And we have – I said with Garibay, I hope I'm pronouncing that correctly, there was a signed waiver where we have neither the signed waiver nor the recorded confession. What – how can any defendant meet that burden? And how – it seems to me it opens the door for police practices that do not meet the requirements of Miranda. Thank you, counsel. Thank you. Good morning. My name is James Haggerty. I'm an assistant United States attorney for the Eastern District of Washington. I was both the trial attorney and the appellate attorney in this matter. It's interesting in the approach that is taken in this case. The information is from Mr. Goodburn that he knew Mr. Patton for approximately 30 years and that he had contact with Mr. Patton. Mr. Patton requested that he assist him in finding a source of pseudoephedrine as well as a location to do this. Mr. Goodburn reports that information. Now, the argument is we have no way of knowing what was actually said on that day. And that's correct. I mean, you don't have a person go in and record it. Obviously, you're not going to have that conversation, that interaction between a criminal defendant and an informant if it pulls out a little tape recorder and starts playing it. But the fact is that the trial testimony, the evidence submitted at trial, documents this request by Mr. Patton for these materials. And that's recorded when he talks about, I have enough to do, I have the case. I'm going up to the hill to cook tonight. I'll get you a sample. So we know from Mr. Patton's own statement that he was engaged in manufacturing. He was predisposed to do that, and that's consistent. The jury believed Mr. Goodburn, and they found credibility based on all of the evidence. Some of the points that were just raised, and it was there is no dispute who owned that equipment. It was Mr. Patton's equipment. Mr. Patton admits in his statement that he owned the equipment, that he gave it to Mr. Goodburn, and that he knew where it was. It's also supported by Mr. Scripner's statement at the time of this transaction. There's an undercover officer. He's having this conversation, and Mr. Patton is using the vernacular. I have enough juice to run with this. I can cook this shit all week long. I can sell it for $50 a gram. Whatever you can give me, I can cook. We can make some money. So, you know, Mr. Patton is talking, and then he's asked, well, do you have the equipment? He says, I have everything I need other than hot water. And the undercover says, that's fine. It's there on this supposed location to go to. And he says, I also need some Coleman. And it's a Coleman fuel that's used as a part of this process. And at that time, the informant, Mr. Goodburn, says, well, I can go get some. And Mr. Scripner steps in and says, no, I put a gallon in the suitcase. So you put one in there? Yeah, yeah. Well, we're good to go. Well, that supports the fact is, if it's, according to Patton's argument, it's Mr. Goodburn's, how does Mr. Scripner, someone who even the defense argues he just came as an afterthought, he was at the end of the day, but he says, I'm going to bring Billy. How does Mr. Scripner get access to Mr. Goodburn's equipment and put Coleman in there? And when that property is searched, there's Coleman in there. Well, it's because Mr. Scripner and Mr. Patton, consistent with Mr. Goodburn and consistent with the statement of Mr. Patton, were the ones that had control of it, and they want to move it. And they want to move it for reasons that Mr. Patton says, I've got a lot of people coming at my house, I'm selling meth, I don't want to cook there, and I don't want to have it around, so I gave it to Mr. Goodburn. So there's no dispute that it was Patton's equipment, and it gives it to Mr. Goodburn to hold because that's where they're going to meet. They're going to meet in Ellensburg. So you're moving the equipment, and the location is in Ellensburg. So you move that equipment. The issue raised about this confession, we had a hearing on that confession. And as a result of that hearing, the judge determined that there wasn't any threats or promises made to the defendant. Crucial in that argument is they submit, how do we show coercion? How do we show these promises? Well, we have testimony from the agents that were present, and they testified that there were no promises. They said your cooperation would give it to the U.S. attorney and to the judge, and they will decide we can't promise you anything. But more importantly, if you want to show coercion, you have to raise the issue. You have a hearing. The purpose of the hearing is to allow the defendant the opportunity to raise this issue and have the government rebut that. Go through the transcripts of any of the hearings or the trial. At no time did Mr. Patton ever suggest or raise the issue that he was coerced, that he was promised anything, that he was threatened, that his will was overborne by these officers in giving the statement. There is no evidence whatsoever, and the defendant had the opportunity to present that evidence and never took advantage of that, not at the hearing nor at the trial. No questions of the agents at either one of those was directed at any threats or promises other than general. They did not specifically say, is it not true that you threatened Mr. Patton? Is it not true that you promised him the moon? And none of that occurred. You look at the defendant's history, which is cited in my brief. Mr. Patton isn't an unsophisticated first-time offender who's just had contact with the system. Mr. Patton's been through the system a lot. Mr. Patton knew exactly what the rights were, the nature of the rights and the effects of any waiver or discussion with the officers. I think it's also interesting in the statement that Mr. Patton comes back. They stop late at night because of the time after the arrest, and then they reinitiate it and advise him of his rights a second time, which he agrees he understands anyway. And he says, well, I've thought about it. I want to tell you the truth, and then proceeds to give more information about what occurred. As to enhancements of the evidence of the flashlight, I want to just quickly on that. The car was seized, and the flashlight was in that. It was taken out of the car. It was placed in an evidence bag, and it was placed in the evidence locker of DEA. What this court is, information came to the government and DEA that drugs were contained within that flashlight. At that point in time, the evidence was opened, and then they found the evidence. So until that point in time, they didn't open it up. They raised this issue on appeal, and I think that I've recited all of the law and why that issue should not be addressed because it was never raised at the court. It was merely, it was untimely. It was never the fact that you need a search warrant, you should not. We had control over it and believed that no search warrant is necessary, nor have they supported that. As for sentencing entrapment, throughout this, Mr. Patton is talking about requesting to get a case of pseudofedrine. And it's also anticipated, based on the nature of the relationship that supposedly is going to be created, that Mr. Patton is going to have an ongoing, constant supply of pseudofedrine from the undercover agent. Mr. Patton requested a case of pseudofedrine. Mr. Patton, in his discussions in a recorded conversation on June 20th, indicates, I've got enough to cook to half the case, you know. And then at the day he gets out there, he says, I have all the equipment, I have all the juice, I can do this. You bring it, I'll cook it. So, therefore, there isn't the situation where the government has thrown out an amount and hoped to lure the defendant in to buy that amount. This is an agreed-upon amount that we brought to the table on that day for the defendant to buy. When he saw it, when he looked at that and said, this is what I need right here, this is what I need, and he tells his partner, Scribner, this is it, this is what we need. And he gets the box and he takes the box. His intent was to take that box, cook as much as he could on that day, and continue to cook. And it was very easy because he had everything other than he just needed to go to the store and buy some more batteries. He had the capability of doing that. He admits in his own statement the knowledge and the capability of manufacturing. In fact, he says, I'm engaged in manufacturing at this time. So there is no sentencing and entrapment. He got exactly what he asked for. I believe that's it. Thank you. All right. Thank you very much, counsel. U.S. v. Patton is submitted. We'll take up Cascadia Wildlands Project v. Conroy. I'm sorry, but you went over your time originally by about two minutes. Thank you.
judges: Noonan, T. Nelson, Wardlaw